# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs May 15, 2013

## STATE OF TENNESSEE v. PATRICK L. MALIANI

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1084    J. Randall Wyatt, Jr., Judge**

---

**No. M2012-01927-CCA-R3-CD - Filed August 5, 2013**

---

A Davidson County jury convicted the Defendant, Patrick L. Maliani, for the sale of less than 0.5 grams of cocaine, and the trial court sentenced him to six years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the trial court erred when it denied his motion to suppress; (2) the trial court erred when it denied his motion to sever offenses; (3) the evidence presented is insufficient to sustain his conviction; and (4) the trial court erred when it sentenced him to the maximum sentence within his range because it failed to apply one applicable mitigating factor. After a thorough review of the record and applicable authorities, we conclude there exists no error in the judgment of the trial court. As such, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

H. Garth Click, Springfield, Tennessee, for the Appellant, Patrick Maliani.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel, Criminal Justice Division; Victor S. Johnson, III, District Attorney General; and Ben Ford, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from drug sales that occurred on November 18, 2010 and November 23, 2010. A Davidson County grand jury indicted the Defendant on two counts: the sale of .5 grams or more of a substance containing cocaine on November 18, 2010, and the sale of

.5 grams or more of a substance containing cocaine on November 23, 2010. Before trial, the charges were both amended to the sale of less than .5 grams of cocaine.

## A. Motion to Suppress

The Defendant filed a motion to suppress any and all identifications of him made by Detective Julie Gilbert. He asserted that the procedure the detective used to identify the Defendant as the "unknown black male that she observed at the two controlled buys at issue in this case was both unduly suggestive and so unreliable as to warrant exclusion." He further contended that the "suggestive and unreliable nature of her out-of-court photo identification irreversibly tainted her later in-court identification of the [D]efendant at his preliminary hearing, and will do so again if she is allowed to testify as to the [D]efendant's identity at any future court appearance."

The trial court held a hearing on the motion to suppress during which the parties presented the following evidence: Detective Julie Gilbert,[1] with the Metropolitan Nashville Police Department, testified she developed Brandina Grass and the Defendant as suspects during an investigation she conducted in November 2010. The detective said that she had a confidential informant contact Grass by telephone on November 18, 2010, and ask to purchase crack cocaine. Grass indicated that she could obtain some cocaine from "her man" at a gas station on Murfreesboro Road. Detective Gilbert drove the confidential informant to the specified location and parked at a gas pump. A short time later, a gray Ford Mustang pulled up to the gas pumps next to the detective's vehicle.

Detective Gilbert testified that Grass and the Defendant were in the Mustang. Grass and the confidential informant went into the gas station while the detective and the Defendant stayed outside. The Defendant exited his vehicle at some point while Grass and the confidential informant were inside the gas station. The Defendant stood within ten feet of the detective's vehicle providing the detective with an opportunity to clearly observe the Defendant.

Detective Gilbert said that members of her unit obtained the Mustang's license tag number during the drug transaction. The detective "ran" the tag number and learned that the vehicle was registered to the Defendant. The detective then used the state computer system to produce a picture of the Defendant, and she identified him as the driver of the Mustang.

---

[1]Detective Gilbert was a detective at the time of the alleged drug transaction. She testified that her title was "officer" at the time of trial. For consistency, we will refer to her as "Detective Gilbert."

The detective said that, using the same confidential informant, she arranged another drug transaction. They again contacted Grass via telephone and asked to purchase crack cocaine. Detective Gilbert drove the confidential informant to a "Knight's Inn" and pulled around to the back of the building as instructed by Grass. The detective said that she pulled up near the location of the room number that Grass had given the confidential informant, and she saw the motel room door opening. Grass walked out and the Defendant stood in the doorway and watched Grass walk down to the stairwell where the drug transaction occurred between Grass and the confidential informant. After the transaction, Grass returned to the hotel room in which the Defendant was also located. The detective once again saw the Defendant's Mustang, positively identifying it by the tag number, in the parking lot of the hotel. Detective Gilbert testified that she was able to recognize the Defendant on this occasion because she had seen him previously and because she had seen his picture when she ran his tag number at the previous drug transaction.

During cross-examination, Detective Gilbert said that the first drug transaction, at the gas station, occurred during the night. She said, however, that the gas station was well lit. She said there was only one set of gas pumps at the gas station, and she was parked closest to the building. The Defendant pulled up on the other side of the same row of pumps with his car headed in the same direction as her own. The detective said that the confidential informant wore a device that transmitted and recorded the sounds made during the drug transaction. The detective did not listen to the conversation due to her close proximity to the "targets," but members of her team were listening. She estimated the total transaction took five minutes. The Defendant, the detective said, was out of his car for three of those five minutes, and she had "several opportunities" to view him "head-on."

Detective Gilbert agreed that she described the Defendant in her report as "MB," meaning "male black." She offered no further description. She agreed she did not provide any of his identifying features.

The detective said that, during the second transaction, she was located one floor below the floor where the room numbers given by Grass were located. She said she parked facing the building. She said she could not see the drug transaction as it occurred because Grass and the confidential informant went into a stairwell. The Defendant stood in the door of the motel room. She observed him through her windshield as they pulled into the parking spot.

The Defendant argued to the trial court that the detective's viewing of the Defendant's mug shot tainted her memory, making her identifications of him "tainted" and inadmissible in any court proceeding against the Defendant. The Defendant cited two cases, one of which was *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The State countered that the detective's identification of the Defendant was reliable.

Based upon this evidence, and arguments of counsel, the trial court found:

> Well, my observation is that I don't know what [Detective] Gilbert could have done any differently or any better than what she did in this case. She has got a CI and through the CI meets Ms. Grass and through her is led to [the Defendant].
>
> Ms. Grass is going to help them get some cocaine, but she has got to go meet "her man." Her man apparently is [the Defendant] and when they go into the convenience store at the service station or wherever they w[ere], pulled in there, a gray Mustang comes in, they got the tag number off of the car. There is somebody that gets out of the Mustang, comes up, she sees him. They check the tag. It comes back to [the Defendant].
>
> I don't know what else she could do. I mean, then she had to know you know, who is [the Defendant] and to say that she couldn't look at some shots of photos to see if that was the driver of the car that night would just, you know, deprive her of any ability to do an investigation if she would just say, well, I don't want to look at any mug shots I am liable to see this guy, you know, something like that.
>
> I am not trying to be silly about it, but in other words, she did the only logical things anybody would do in her position and then another day a little later on meet with the [D]efendant again at Knights over across the railroad here and get the room number, M. Grass comes . . . out, there is the [D]efendant, go back in with the [D]efendant, tag number, same car again and it is the same person again.
>
> She has identified him both times, so I don't know what she could have done any differently, unless she just decided not to follow through on her investigation, that doesn't make sense, so I know *Biggers*.
>
> I am very familiar with the *Biggers* case as a matter of fact, before I was even a lawyer . . . so anyway with all due respect . . . I think that the motion to suppress the identification must be and is going to be respectfully overruled . . . .

In a written order filed later, the trial court explained "analyzing the *Biggers* factors . . . under the totality of the circumstances presented, the identification made by Detective

Gilbert had sufficient indicia of reliability to be admissible at trial." The trial court, therefore, found that her identifications would not be suppressed.

### B. Motion to Sever Offenses

The Defendant filed a motion to sever the offenses. He noted that the indictment contained two counts, each count relating to a drug sale that occurred on two separate dates. He said that severance was necessary to promote a fair determination of his guilt or innocence.

Detective Gilbert testified substantially similar to her testimony at the motion to suppress, adding that the cocaine seized after the November 18 drug transaction weighed approximately .6 grams and field tested positive for cocaine. She said that the November 23 transaction yielded .5 grams of cocaine. Detective Gilbert said that she obtained warrants for the Defendant and Grass, both of whom were later arrested.

During cross-examination, the detective testified that she did not see the Defendant ever handle the drugs or the money during the drug transactions. She said the Defendant and Grass spoke before or after the transactions but that she did not know the substance of their conversation. Detective Gilbert said that, during the November 18 drug transaction, when the Defendant exited the Mustang, he stared at the detective, who was still seated in her car. She said, during the second transaction, she saw him standing near the doorway of the hotel room. She estimated she saw him on that occasion for less than five minutes.

The Defendant asked for these two offenses to be severed because of the prejudicial effect of the officer's testimony. The Defendant explained there was a prejudicial effect of the officer stating that she saw the Defendant at both locations when there was no other proof that the Defendant had engaged in any of the criminal conduct that occurred between Grass and the confidential informant. The State cited several cases for the proposition that drug transactions within a short period of time can evidence a common scheme or plan, meaning the Defendant was not entitled to a severance of offenses.

The trial court ruled as follows:

[L]istening to Officer Gilbert's testimony apparently on November 18th around six o'clock she talked to [Grass] . . . about the drug situation that she was working on the Crime Suppression Unit on and she needed to see "her man" to get the drugs.

According to the officer, that happened, she observed and can identify

-5-

the [D]efendant as being apparently . . . Grass's man and then five days later on the 23rd of November a similar situation. She is attempting to get drugs and working with the CI and gets information that they can do the same thing, but essentially it is a different location maybe from "her man" who apparently both times is [the Defendant] and [Detective] Gilbert, the officer here today testified that this is this person that . . . she got a good look at him and that he in fact was staring at her, so it is pretty obvious that . . . that is the issue of identity.

I realize that Officer Gilbert wasn't privy to the conversation and wasn't standing there with the people, but there is something called circumstantial evidence based on the information you had, what it lead to not once but twice that this man was involved in obtaining the drugs to help Ms. Grass to use in this case, so I think under all of the circumstances this man's conduct is important, relative to the case.

I think the identification is an issue and I think under these two cases at least probably more that it is a continuing episode, a continuing scheme or whatever word you want to use for it, of multiple drug transactions and your motion will be respect[fully] overruled and denied.

The trial court subsequently filed a written order stating:

[T]he Court finds that the State has demonstrated all three (3) requirements to avoid severance of the two (2) counts of Sale of a Controlled Substance.

The Court finds that the Defendant's alleged offenses were part of a common scheme or plan. The Court finds that Detective Gilbert used the same CI on both occasions to contact the co-defendant to arrange for the sale of crack cocaine. The Court finds that in both instances Detective Gilbert drove the CI to the location, wherein she observed the co-defendant with the Defendant, and the CI successfully purchased drugs on both occasions. The Court finds that these two sales were approximately five (5) days apart. The Court finds that the similarities in these instances establish a common scheme or plan which was to exchange money for drugs. In addition, the Court finds that the evidence of one of the incidents would be relevant to the other, in that the other incident would be relevant and probative as to identity, motive, and guilty knowledge. Lastly, the Court finds that the evidence of each offense is highly probative to material elements of the charged offenses and its probative value is not outweighed by the danger of unfair prejudice.

## C. Trial

On June 11, 2012, the Defendant was tried on two charges of the sale of less than .5 grams of cocaine. At the trial, the parties presented the following evidence: Detective Gilbert testified, and her testimony substantially complied with the testimony she had offered during both motions hearings. She again described how on November 18 the confidential informant arranged for a $40 drug purchase at a gas station with Grass, who said she could get cocaine from "her man." The detective said she drove her confidential informant to the gas station. When they arrived, the confidential informant's cellular phone rang, and, after speaking with the caller, the confidential informant told Detective Gilbert to roll down her window. Detective Gilbert complied and, when she looked out the window, she saw Grass in the passenger seat of a gray Mustang. The detective said that the confidential informant, who was wearing a wire, and Grass then went inside the gas station and conducted the drug transaction. Law enforcement officers recorded the transaction between Grass and the confidential informant.

Detective Gilbert said that, while the two were in the gas station, the Defendant exited the Mustang. Law enforcement officers obtained the Mustang's vehicle tag number and later confirmed the vehicle was registered to the Defendant. He walked to the front of his car and stood in front of the detective's car looking around, both at traffic and directly at the detective. It appeared to the detective that the Defendant was acting as a "look-out" during the drug transaction. Detective Gilbert estimated that the Defendant was within her eyesight for between three and five minutes. The detective said the informant returned to the car and gave the detective the substance she had purchased. It field tested positive for cocaine, weighing .6 grams.

Detective Gilbert said that, through the vehicle tag number, she obtained the car registration for the Mustang and also a picture of the registered owner, the Defendant. The photograph of the owner was of the man whom she saw during the drug transaction.

Detective Gilbert described working with the same confidential informant on November 23. The confidential informant called Grass and arranged for the purchase of a similar amount of cocaine. Grass again indicated that she had to get the drugs from "her man," and the purchase was arranged to take place at the Knight's Inn. As they pulled into the parking lot of the Knight's Inn, the informant called Grass to inform her that they had arrived. The detective saw Grass, who was on the upper level of the hotel, exit a room. The room was on the third, top level of the hotel. Standing in the doorway, as Grass exited, was the Defendant. Grass and the informant met in a stairwell, and the detective monitored their conversation via a recording device worn by the informant. As the detective and the informant were leaving, the detective saw the Defendant still standing in the doorway of the

hotel room. The informant again gave the detective the substance she purchased, and it field tested positive for cocaine, weighing .5 grams.

After dropping the confidential informant back where the detective had picked her up, the detective returned to the Knight's Inn. She said that she circled the parking lot, and located the Defendant's Mustang in the parking lot.

During cross-examination, Detective Gilbert testified that she did not go into the gas station during the November 18 drug transaction. She was, therefore, unaware whether there was anyone else in the gas station during the drug transaction. She said that, before the November 18 drug transaction, she had seen Grass, and she watched Grass and the confidential informant enter the gas station. Detective Gilbert said that she had never, however, previously seen the Defendant.

Detective Gilbert testified about the November 23 drug transaction, saying that Grass told them to go to the back of the hotel. The confidential informant called Grass when they arrived at the hotel, and the detective saw Grass exiting a room. She said this was how she knew where to park her vehicle. Detective Gilbert estimated that she saw the Defendant for "[a] few seconds" before parking her vehicle. The detective said it was dark and agreed that the area was illuminated by lights outside of the rooms.

On redirect examination, Detective Gilbert testified that she reviewed the audio recording of the November 18 drug transaction. There were two voices primarily heard on the recording. A third male voice could be heard, but the detective opined that this third voice was likely the gas station clerk. The third voice, the only male voice, on the recording sounded the same as the voice recorded during the November 23 drug sale. The Detective addressed the November 23 drug sale, saying that the Defendant maintained his position in the doorway of the hotel room when she saw him before and after the drug sale. She opined that his position was consistent with someone acting as a "look-out" during the sale.

During re-cross examination, the detective agreed that the total duration of time that she saw the Defendant during the second drug transaction was seconds.

Special Agent Bret Trotter with the Tennessee Bureau of Investigations testified that he tested the drugs in this case. The weight of the substances submitted, which he determined were in fact cocaine, were .32 and .41 grams, respectively.

The Defendant recalled Detective Gilbert, who agreed that the TBI's assessment of the weight of the cocaine was less than her field tests. She explained that the wrapper around the cocaine, which appeared to be a silver gum wrapper, could weigh .2 to .3 ounces, which

might account for the discrepancy. This, she said was a common occurrence. The detective said that her report listed the substance as being weighed while in a foil wrapper. She further agreed that a charge for .3 or .4 grams of cocaine is different from a charge for .5 or .6 grams of cocaine.

Based upon this evidence, the jury found the Defendant guilty of count one, sale of less than .5 grams of cocaine, and not guilty of count two, sale of less than .5 grams of cocaine.

### D. Sentencing Hearing

At the sentencing hearing, the State offered a presentence report. The State informed the trial court that the Defendant was a Range I offender. The trial court acknowledged that, as such, the Defendant's range of punishment was between three and six years. The Defendant argued that the most serious offense in his criminal history was DUI-related. Further, the Defendant asserted he was an "excellent candidate for probation."

The trial court filed a sentencing order in which it found that the Defendant was a Range I, standard offender. It further found:

Enhancement Factors
The Court finds that the State has demonstrated the applicability of one (1) enhancement factor. The Court finds that the Defendant has a previous history of criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The Court finds that the Defendant has the following history: twelve (12) convictions for Criminal Trespass, two (2) convictions for Driving Under the Influence, one(1) conviction for Drug Paraphernalia, one (1) conviction for Disorderly Conduct, one (1) conviction for Resisting Arrest, and one (1) conviction for Driving on a Suspended Licence. The Court places great weight on this factor.

The trial court then found that there were no applicable mitigating factors. The trial court then decided whether the Defendant's sentence should be served in confinement:

Manner of Service

The Defendant contends that he is a favorable candidate for alternative sentencing in this case. When determining if incarceration is appropriate, a trial court should consider whether: (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct; (2) confinement is needed to avoid depreciating the seriousness of the offense or

confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses; or (3) less restrictive measures than confinement have frequently or recently been applied unsuccessfully to the defendant. Tenn. Code Ann. § 40-35-103. The Court notes that the potential or lack of potential for the rehabilitation or treatment of a defendant should be considered as well. Tenn. Code Ann. § 40-35-103(5).

Regarding the aforementioned factors, the Court finds that while the Defendant does not have any prior felonies on his record, he has been convicted of eighteen (18) misdemeanors since moving to the United States in 2002. Furthermore, the Court finds that less restrictive measures than confinement have been recently applied unsuccessfully to the Defendant, as he has violated the terms of his probation that he received for his second conviction for Driving Under the Influence. Therefore, the Court finds that confinement is necessary in the Defendant's case.

Accordingly, the trial court sentenced the Defendant to serve six years in the Tennessee Department of Correction. The trial court found that this sentence was the minimum necessary to protect society and is the least severe measure necessary to appropriately punish the Defendant for the offense committed.

## II. Analysis

On appeal, the Defendant contends: (1) the trial court erred when it denied his motion to suppress; (2) the trial court erred when it denied his motion to sever offenses; (3) the evidence presented is insufficient to sustain his conviction; and (4) the trial court erred when it sentenced him to the maximum sentence within his range because it failed to apply one applicable mitigating factor.

### A. Motion to Suppress

The Defendant contends that Detective Gilbert's identification of him should have been suppressed because the method by which she identified him was "unduly or unnecessarily suggestive." Further, he contends that any of the detective's subsequent identifications of him were not "free of the taint of the initial identification." The State counters that Detective Gilbert's training and experience as a narcotics officer and her ability to see the Defendant in close proximity for between three to five minutes rendered her identification reliable. Further, the State asserts, the circumstantial evidence tying the Defendant to the drug deal, including his car being at the scene, support the detective's identification.

"This Court will uphold a trial court's findings of fact in a suppression hearing unless

the evidence preponderates otherwise." *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions, and the trial court's findings of fact are subject to de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).

In *Neil v. Biggers*, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. *Id.* If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id.* (interior quotations omitted). The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* If, however, the court first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification, there is no need to apply the totality of the circumstances test outlined in *Biggers*. *See State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

The defendant in *Biggs*, cited by the State, similarly complained that a narcotics officer's pretrial identification of him based on his driver's license photograph should have been suppressed because the identification procedure of viewing a single photograph was unduly suggestive. 211 S.W.3d at 748. The officer in *Biggs* viewed the single photograph of the defendant some two months after the undercover drug transaction in which the officer participated, and the officer was unable to later identify the defendant at trial. *Id.* This Court nevertheless affirmed the trial court's denial of the defendant's motion to suppress the pretrial identification, concluding that the officer's training and experience rendered his identification

more reliable than that of the average layperson.  We wrote:

> Further, the defendant's argument fails to acknowledge that Officer Thayer was a trained and experienced police officer and not a lay witness.  The authorities are clear that this distinction must be made.  *See Manson v. Brathwaite*, 432 U.S. 98, 115, 97 S. Ct. 2243, 2253, 53 L. Ed.2d 140 (1977) (in assessing the degree of attention paid by the witness, the court noted that "Glover was not a casual or passing observer, as is so often the case with eyewitness identification.  Trooper Glover was a trained police officer on duty and specialized and dangerous duty when he called at the third floor of 201 Westland in Hartford on May 5, 1970."); *United States v. Dring*, 930 F.2d 687, 693 (9th Cir.1991) (identifications of single photograph of defendant two weeks after event by customs agents not tainted because agents "were trained professionals, expert at observing criminals, and each agent had a good opportunity to view the person on the pier during the night in question"); *Thomas v. State*, 139 Md. App. 188, 775 A.2d 406, 420 (2001) (six-week delay between drug sale and officer's viewing of single photograph did not make unreliable his in-court identification of defendant when officer had stood "within arm's length, for three or four minutes under bright lights," officer's "entire attention was focused" on defendant, and officer "was not a lay witness describing a criminal to police; he was a police officer making a mental note of what he had seen during the commission of a crime.").

> Based upon the proof before the trial court that Officer Thayer, a trained and experienced narcotics officer, viewed the defendant in the daylight on three occasions for a total of at least two minutes, the last and lengthiest of these being face-to-face, and two months later was positive in his identification of the defendant from a photograph, we conclude that the record supports the trial court's determination that the motion to suppress was without merit.

*Id.* at 751-52; *see also State v. Brian Davidson*, No. W2007-00294-CCA-R3-CD, 2008 WL 4253225, at *5-6 (Tenn. Crim. App., at Jackson, Sept. 9, 2008) (holding that a detective's pretrial identification of a suspect from a photograph was not unduly suggestive and did not taint the detective's in-court identification of the suspect), *no. Tenn. R. App. P. 11 application filed*.

The trial court in the case under submission found, "analyzing the *Biggers* factors . . . under the totality of the circumstances presented, the identification made by Detective Gilbert had sufficient indicia of reliability to be admissible at trial."  The record supports these findings.  Detective Gilbert, a trained narcotics officer, was conducting an investigation into

-12-

suspects selling drugs in her jurisdiction. As part of this investigation, she worked with a confidential informant, who arranged a drug transaction with Grass, who said she was going to get the drugs from "her man." During the arranged drug transaction, the detective waited in the car while the confidential informant and Grass went inside the gas station. Detective Gilbert observed the Defendant get out of the Mustang in which he and Grass drove to the gas station. The gas station was well-lit, and the Defendant looked directly at the officer several times during the three to five minutes Grass and the informant were in the gas station.

Detective Gilbert was a narcotics officer conducting a narcotics investigation. Under such circumstances, an officer would pay particular attention to the identity of those involved in the drug transaction, in an attempt to further develop suspects. Detective Gilbert then processed the license tag number of the vehicle in which Grass and the Defendant arrived at the gas station, and she learned the vehicle was registered to the Defendant. When she viewed the Defendant's picture, she recognized him as the man she had seen during the drug transaction. We conclude that this procedure was not unduly suggestive and did not taint the detective's identification of the Defendant. Accordingly, we affirm the trial court's denial of the Defendant's motion to suppress the in-court identification.

### B. Motion to Sever

The Defendant next contends that the trial court erred when it denied his motion to sever offenses. He asserts that the offenses should have been severed because the proof of each controlled buy did not show a common scheme or plan and, further, allowing proof of one offense at the trial of the other violated Tennessee Rule of Evidence 404. The State counters that the trial court properly denied the Defendant's motion to sever because the two offenses were part of a continuing criminal scheme and also important to show the identity of the Defendant.

We review a trial court's denial of a motion for severance for an abuse of discretion. *See State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). As such, a trial court's refusal to sever offenses will not be reversed unless the court applied an incorrect legal standard, reached an illogical conclusion, based its ruling on a clearly erroneous standard assessment of the evidence, or applied reasoning that caused injustice to a complaining party. *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010). Also, a trial court abuses its discretion when it fails to consider the factors provided by a higher court as guidance for determining a particular issue. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007).

Tennessee Rules of Criminal Procedure 8 and 13(a) allow for the consolidation of two or more indictments where the offenses either are part of a "common scheme or plan" or are of the "same or similar character." However, under Tennessee Rule of Criminal Procedure

14(b)(1), a defendant "shall have a right" to a severance of offenses that have been consolidated unless: (1) the offenses are "part of a common scheme or plan"; and (2) "the evidence of one would be admissible upon the trial of the others." When a defendant seeks a severance, the burden is on the State to show that the offenses should not be severed. *State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004).

"[I]rrespective of whether a defendant formally moves for severance or whether a defendant merely objects to the [S]tate's pre-trial motion for consolidation, the issue properly preserved is one of severance," which we evaluate under Tennessee Rule of Criminal Procedure 14. *Spicer v. State*, 12 S.W.3d 438, 444 (Tenn. 2000). Thus, if a defendant objects to the consolidation of offenses that would otherwise be permissible under Rule 8(b), the offenses may not be tried together unless the two criteria listed in Rule 14(b)(1) are present: (1) "the offenses are parts of a common scheme or plan"; and (2) "the evidence of one would be admissible in the trial of the others." The primary issue is whether "evidence of one offense would be admissible in the trial of the other if the two offenses remained severed." *Id.* at 445 (citing *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984)). Thus, "[i]n its most basic sense, . . . any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (citing *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)).

In order to determine whether "evidence of one [offense] would be admissible in the trial of the other," a trial court, in essence, must determine whether proof of a defendant's alleged bad act may be admitted in his trial for another alleged bad act. *See State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Thus, this determination implicates Tennessee Rule of Evidence 404(b), which bars the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." Rule 404(b)'s purpose is to avoid "the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt of the specific charge." *Id.* Given that this risk of unfair prejudice is even higher where the defendant's bad act is similar to the crime for which the defendant is on trial, "any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant." *State v. Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011).

In summary, a trial court must determine that the following three things are true in order to deny a defendant's motion for severance:

(1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); *Moore*, 6

S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3).

*Spicer*, 12 S.W.3d at 445.

In our examination of the first factor, whether the two drug sales were part of a common scheme or plan, we note that this Court has, in similar cases, held that multiple drug transactions can qualify as a common scheme or plan. *See State v. Steve Mosley*, No. 01C01-9211-CC-00345, 1993 WL 345542, at *4 (Tenn. Crim. App., at Nashville, Sept. 9, 1993) (holding, "In the case at bar, four of the indicted offenses occurred within a three-day period and the other occurred approximately six weeks later. All of the offenses involved the same controlled substance, the same defendant, the same informant and the same witnesses. It was such a continuous episode and so closely related that the proof was essentially the same in each case.), *perm. app. denied* (Tenn. Dec. 28, 1993); *see also State v. Joseph Clyde Beard, Jr.*, No. 03C01-9502-CR-00044, 1996 WL 563893 (Tenn. Crim. App., Knoxville, Sept. 26, 1996),(finding "common scheme" where same informant purchased similar amounts of cocaine from same defendant for same amount of money in same location although transactions occurred a month apart), *perm. app. denied* (Tenn., Feb. 3, 1997); *State v. Wayne Hymes Richards, a/k/a Pete Richards*, No. 03C01-9503-CR-00102, 1996 WL 384897, at *2 (Tenn. Crim. App., at Knoxville, July 8, 1996) (holding a common scheme or plan existed when the offenses occurred within forty-eight hours and each involved a sale of a single ounce of marijuana for a price set by the defendant and paid in cash to the defendant. Each involved the same buyer and companion, which was the confidential informant. In both cases the undercover officer picked the defendant up at the same place and then drove to the same residence. Each time the defendant then left the other two and entered the residence where he obtained the marijuana. Both times the defendant then rejoined the other two men and delivered the marijuana.); *State v. Roger D. Pulley*, No. 01C01-9501-CC-00013, 1995 WL 555060, at *2 (Tenn. Crim. App., at Nashville, Sept. 20, 1995) (severance inappropriate where the five drug offenses "occurred within eight weeks of one another and involved virtually the same sequence of events, the same confidential informant, and the same established procedure.")

In the case under submission, the same police detective, along with the same confidential informant sought to purchase drugs from the same seller, Grass. On both occasions, Grass indicated that she needed to obtain the drugs from "her man." The Defendant was present at both drug sales and acted as a look out on both occasions. Each time, a small quantity of crack cocaine was purchased. The similarities between the two offenses establish a common scheme or plan, and the proof was basically equivalent in each case.

The second factor requires us to examine whether evidence of one offense is relevant to some material issue in the trial of all the other offenses. The trial court found that the evidence of one of the incidents would be relevant to the other, in that the other incident would be relevant and probative as to "identity, motive, and guilty knowledge."

Rule 404 of the Tennessee Rules of Evidence is pertinent:

(b) Other Crimes, Wrongs, or Acts.-Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with the character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The general rule prohibiting evidence of other crimes has several exceptions. Proof of the intentional commission of the other crimes would be admissible under Tennessee Rule of Evidence 404(b) to rebut the defendant's claim that he was a mere observer. In *Richards*, 1996 WL 384897, at *2, our Court held severance was not warranted on two separate charges of delivery of marijuana, where the proof of the "defendant's participation in each offense was probative of both his identity and his guilty knowledge as to the other offense.

In line with *Richards*, we agree with the trial court that the proof of these two separate offenses was relevant to the other to prove identity, motive, and guilty knowledge. The Defendant argued at trial that he merely "stood there, not doing anything" during the drug transactions. The State offered the evidence of the two separate drug transactions to show that the Defendant had knowledge that a drug transaction was occurring, that he acted as a look-out, and that he was the "man" to whom Grass referred. We conclude that this evidence was relevant.

We further agree with the trial court that the probative value of the admission of evidence of both offenses was not outweighed by their prejudicial effect. *See* Tenn. R. Evid. 404(b)(3). The evidence of the two sales was highly probative to the Defendant's knowledge

-16-

that a drug deal was occurring and his participation in it. The prejudicial effect of this evidence was mitigated by the trial court's instruction to the jury that each count of the indictment was "a separate and distinct offense" and that the jury must "decide each count separately on the evidence and the law applicable to it." We conclude, therefore, that the probative value was not outweighed by the prejudicial effect.

We conclude that the trial court did not err when it determined that the State had proven that severance was not warranted. *See Spicer*, 12 S.W.3d at 445. As such, we conclude that the Defendant is not entitled to relief on this issue.

## C. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for the sale of less than .5 grams of cocaine. The State counters that the jury could have reasonably inferred from the evidence that the Defendant was an active and knowing participant, possibly even the director of the criminal enterprise, with Grass acting on his behalf. The State further asserts that the evidence showed that the Defendant was criminally responsible for the acts of Grass in the sale of cocaine.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury

> see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of the delivery of a Schedule II Controlled Substance pursuant to Tennessee Code Annotated section 39-17-417 (2012). That statute provides, in relevant part, that it is an offense for a defendant to knowingly . . . sell a controlled substance. *See* T.C.A. § 39-17-417(a)(3). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). A violation of this offense involving cocaine weighing less than one-half gram is a Class C felony. T. C.A. 39-17-417(c)(2)(A).

Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." T.C.A. § 39-11-401, *Sentencing Comm'n Cmts*. A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *See id.* To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first

degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App.1 976)).

In the case under submission, we conclude that the evidence viewed in the light most favorable to the State is sufficient to prove that the Defendant was criminally responsible for the sale of less than .5 grams of cocaine. The evidence supporting the Defendant's conviction show that a confidential informant called Grass to arrange to purchase drugs. Grass told the informant she could obtain drugs from "her man" and arranged for the sale to occur at a gas station. Detective Gilbert drove the informant to the gas station, and the Defendant arrived shortly thereafter, driving a Mustang registered to him, with Grass in the passenger seat. Grass and the informant went inside the gas station to conduct the drug transaction. During this time, the Defendant exited his Mustang and acted as a "look-out," looking around and directly at the detective, who was still seated in her car. Grass then returned to the Defendant's Mustang, and the two drove away. We conclude that the Defendant's presence and companionship with Grass before and after the commission of the offense, along with his actions during the offense, are circumstances from which his participation in the crime may be inferred. *See Ball*, 973 S.W.2d at 293. The evidence is sufficient to support his conviction, and he is not entitled to relief on this issue.

## D. Sentencing

The Defendant asserts that the trial court erred when it sentenced him to the maximum sentence within his range because it failed to apply one applicable mitigating factor. The Defendant contends that the trial court should have applied the mitigating factor that his conduct "neither caused nor threatened serious bodily injury."

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353,

§§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness." *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278–79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion " 'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007) and discussing Federal sentencing guidelines). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51 (discussing Federal sentencing guidelines).

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation

or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

We conclude that the trial court imposed a within-range sentence based upon application of one enhancement factor and no mitigating factors and after consideration of the purposes and principles of sentencing. The trial court conducted a thorough review of the Defendant's case and circumstances, guided by the relevant legal principles. Accordingly, the trial court did not abuse its discretion when it sentenced the Defendant to six years for his conviction for the sale of less than .5 grams of cocaine. The Defendant is not entitled to relief.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court properly denied the Defendant's motion to suppress and his motion for severance. We further conclude that the evidence is sufficient to sustain his conviction and that the trial court properly sentenced him. Accordingly, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE